UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

VALINSIA JONES                                        CIVIL ACTION

VERSUS                                                NO. 17-5324

NANCY A. BERRYHILL, ACTING                            SECTION "B" (2)
COMMISSIONER OF SOCIAL SECURITY

## FINDINGS AND RECOMMENDATION

Plaintiff, Valinsia Jones, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Act.  42 U.S.C. §§ 423, 1382c.  This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.    PROCEDURAL HISTORY

Jones filed applications for DIB and SSI on May 7 and 15, 2012, respectively.  She alleged disability since April 15, 2010, due to anxiety, cancer in her right eye, diabetes, Graves' disease, thyroid cancer and heart problems. (Tr. 185-98).  After the Commissioner denied her applications on July 16, 2012 (Tr. 99-102), plaintiff requested an administrative hearing before an ALJ, which was held on September 23, 2013.  (Tr. 30-44).  On January 16, 2014, the ALJ issued a decision finding Jones not disabled.  (Tr. 79-90).

The Appeals Council granted plaintiff's request for review and remanded the matter to the ALJ for additional findings on June 26, 2015. (Tr. 93-96). The ALJ held a second hearing on October 16, 2015. (Tr. 45-61).[1] On December 21, 2015, the ALJ issued a second decision denying plaintiff's DIB and SSI applications. (Tr. 8-23). After the Appeals Council denied review on March 24, 2017, the ALJ's decision became the Commissioner's final decision for purposes of this court's review. (Tr. 1-4).

Jones filed a timely memorandum in support of her appeal, to which she attached a purported "Statement of Uncontested Material Facts" that summarizes the medical records. Record Doc. No. 12. Because her combined memorandum and statement of facts do not exceed the page limit imposed by Local Rule 7.7 for the single memorandum of facts and law that she was ordered to file, Record Doc. No. 11, the court has considered all of her submissions. Defendant filed a timely reply memorandum of facts and law with a one-page, attached response to plaintiff's Statement of Uncontested Material Facts. Together, defendant's submissions do not exceed the court's page limitation and have been considered. Record Doc. No. 13.

II.    STATEMENT OF ISSUE ON APPEAL

Plaintiff contends that the Commissioner made the following error:

A.    The ALJ erred in rejecting the findings of both consultative examiners and relying instead upon his own medical opinion.

---

[1]The hearing transcript incorrectly states that the hearing was held on October 16, 2013 (Tr. 45), but the remainder of the record is clear that it was in 2015.

III.    ALJ'S FINDINGS RELEVANT TO ISSUE ON APPEAL

1.    Although Jones engaged in substantial gainful employment for six months in 2012, there has been a continuous 12-month period(s) during which she did not engage in substantial gainful employment. The ALJ's findings relate to that period(s).

2.    Through her date last insured of September 30, 2015, she had severe impairments of Graves' disease[2] attended by ophthalmopathy,[3] goiter[4] and diabetes mellitus, type II. The medical record does not support her allegation of a cardiac condition. Her medically determinable impairment of depression is nonsevere. Jones has the residual functional capacity to perform the full range of light work.

3.    Her medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

4.    Jones is capable of performing her past relevant work as a fast food worker.

---

[2]Graves' disease, a form of hyperthyroidism, "is an autoimmune disease characterized by goiter, rapid and irregular heartbeat, weight loss, irritability, anxiety, and often a slight protrusion of the eyeballs." MedlinePlus Medical Dictionary (Merriam-Webster, Incorporated 2018), http://c.merriam-webster.com/medlineplus/graves%20disease (last visited Jan. 10, 2018). Common signs and symptoms of Graves' disease include anxiety and irritability; fine tremor of the hands or fingers; heat sensitivity and increased perspiration or warm, moist skin; enlargement of the thyroid gland (goiter); bulging eyes (Graves' ophthalmopathy); fatigue; and rapid or irregular heartbeat (palpitations). Mayo Clinic.org (Mayo Foundation for Medical Education and Research 2018), https://www.mayoclinic.org/diseases-conditions/graves-disease/symptoms-causes/syc-20356240 (last visited Feb. 15, 2018).

[3]Ophthalmopathy is "any disease of the eye." Dorland's Medical Dictionary for Health Consumers (Saunders 2007), https://medical-dictionary.thefreedictionary.com/ophthalmopathy (last visited Feb. 12, 2018). In Graves' ophthalmopathy, inflammation and other immune system events affect muscles and other tissues around the eyes. Resulting signs and symptoms may include bulging eyes (exophthalmos), gritty sensation in the eyes, pressure or pain in the eyes, puffy or retracted eyelids, reddened or inflamed eyes, light sensitivity, double vision and vision loss. Mayo Clinic.org, https://www.mayoclinic.org/diseases-conditions/graves-disease/symptoms-causes/syc-20356240 (last visited Feb. 15, 2018).

[4]A goiter is "[a] chronic enlargement of the thyroid gland, not due to a neoplasm." Stedman's Medical Dictionary (Wolters Kluwer Health 2018), http://www.medilexicon.com/dictionary/37985 (last visited Jan. 22, 2018).

5.    She has not been under a disability from April 15, 2010, the alleged onset date, through the date of the decision.

(Tr. 13-22).

IV.    ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461. This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. Halterman ex rel. Halterman v. Colvin, 544 F. App'x 358, 360 (5th Cir. 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364. The Commissioner, rather than the courts, must resolve conflicts in the evidence. McCaskill v. Dep't of Health & Human Servs., 640 F. App'x 331, 335 (5th Cir. 2016) (citing Perez,

415 F.3d at 461); Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for SSI or DIB,[5] plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2015). The regulations

---

[5]The relevant law and regulations governing claims for DIB and SSI are identical. Carmon v. Barnhart, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (citing Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)); Baltierra v. Chater, 70 F.3d 1268, 1995 WL 696740, at *1 (5th Cir. Oct. 19, 1995) (citing Haywood v. Sullivan, 888 F.2d 1463, 1467 (5th Cir. 1989)); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *1 (5th Cir. Apr. 5, 2001) (citing Haywood, 888 F.2d at 1467).

include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[6]  Id. §§ 404.1520, 416.920; Alexander v. Astrue, 412 F.  App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Id.

The claimant has the burden of proof under the first four parts of the inquiry.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of

_____

[6]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is found not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'"  Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.    Factual Background

At the first hearing on September 23, 2013, Jones said she sees a doctor every two months at the Ambulatory Care Clinic at Chabert Medical Center[7] for her thyroid, but that her most recent medical records were not in the record.  The ALJ said he would direct the agency to obtain the missing records.  (Tr. 35-37).

Jones testified that she has been disabled since her alleged onset date in April 2010 because she has been sick "a lot" or "all the time."  She said she has heart problems and pain in her legs and feet.  She stated that her last job was as a caregiver for Glory Divine about one to two years previously.  (Tr. 38).  She could not confirm the information on her application stating that she had worked as a caregiver at a care center from September 2011 until April 2012.  She said she stopped working about a year before the hearing because she

---

[7]"Chabert" is misspelled phonetically in the transcript as "Chavere."

7

was having heart problems, which led to making an appointment with her thyroid doctor at Chabert, and she now takes medication for her heart.  (Tr. 39).

Plaintiff testified that she goes to the emergency rooms at Chabert and Thibodaux General Medical Center[8] for treatment, but could not remember the last time she went to either one.  She stated that Dr. Travis Landry at the Thibodaux General emergency room first diagnosed her with Graves' disease about two years before the hearing and that he referred her to the Ambulatory Care Clinic.  (Tr. 39-40).  Jones testified that she takes methimazole[9] and propylthiouracil[10] for Graves' disease, metformin[11] for diabetes and propanolol[12] for blood pressure and heart problems, all prescribed by her doctor at Chabert. (Tr. 40-41).  She said she takes her medications, but does not monitor her blood sugar.  She

---

[8]The transcript spells this facility phonetically as "Siloid."  Plaintiff's medical records establish that Thibodaux Regional Medical Center was the only place she was treated other than Chabert. Therefore, the court substitutes "Thibodaux" for "Siloid" wherever it appears in the transcript.

[9]The correct spelling of plaintiff's medications is on the list she filed in support of her applications.  (Tr. 234).  Tapazole (generic name:  methimazole) is "used to treat hyperthyroidism (an overactive thyroid gland). . . .  When you have hyperthyroidism, your thyroid gland makes too much thyroid hormone.  Tapazole works by stopping the thyroid gland from making thyroid hormone, thereby helping to restore the balance in your body."  PDR.net (PDR, LLC 2018), http://www.pdr.net/pdr-consumer-monograph/tapazole?druglabelid=1493&ConsumerId=5707 (last visited Feb. 5, 2018).

[10]Propylthiouracil also "works by stopping the thyroid gland from making thyroid hormone." Id., http://www.pdr.net/pdr-consumer-monograph/propylthiouracil?druglabelid=787&ConsumerId=5706 (last visited Feb. 5, 2018).

[11]Glipizide/metformin hydrochloride is a combination medicine used with diet and exercise to help control high blood sugar in adults with type 2 diabetes.  Id., http://www.pdr.net/pdr-consumer-monograph/glipizide-metformin?druglabelid=1791&ConsumerId=1655 (last visited Feb. 5, 2018).

[12]Propranolol hydrochloride is a beta-blocker used alone or in combination with other medicines to treat high blood pressure, chest pain, atrial fibrillation or tremors, or to prevent migraines.  Id., http://www.pdr.net/pdr-consumer-monograph/propranolol-tablets?druglabelid=1400&ConsumerId=5108 (last visited Feb. 5, 2018).

stated that Graves' disease makes her eye "big and buggy" and she loses her eyesight. She testified that she is supposed to have radiation treatment for her thyroid once her thyroid condition is under control, which will also help with her eye problems. (Tr. 41).

Plaintiff stated that she does not wear contact lenses. She said her vision is not good and she could lose her eyesight because of Graves' disease. She testified that her eye doctor at Chabert told her she needs to get her blood sugar and her thyroid under control to help her eye problems. She said she has an upcoming appointment with the eye doctor. She stated that Graves' disease makes it difficult to remember things and to concentrate. The ALJ decided to send Jones to a consulting internist who could evaluate her thyroid and her vision. (Tr. 42).

A second hearing was conducted on October 16, 2015. Jones testified that she began having "faintness of the heartbeats," shortness of breath and numbness in her feet, legs and fingers in April 2010, but has never been hospitalized for her conditions. (Tr. 49-50). She said she went to Thibodaux General at that time and was told to consult a primary care doctor for her thyroid and Graves' disease. She stated that Dr. Monisha Chadha, a thyroid specialist, diagnosed Graves' disease in 2010. Plaintiff testified that she sees Dr. Chadha every six months, but has her thyroid levels checked every two months. (Tr. 50). She said she takes methimazole for her thyroid, propanolol to slow her heartbeat and Vistaril[13] to

---

[13]Vistaril (generic name: hydroxyzine pamoate) is used to relieve anxiety and tension associated with certain conditions or to manage itching due to allergic conditions. Id., http://www.pdr.net/pdr-consumer-monograph/vistaril?druglabelid=3067&ConsumerId=5513 (last visited Jan. 25, 2018).

help her sleep, and has been taking Prozac[14] "for the anxiety depression" for the past two months. (Tr. 50-51). She stated that her psychiatric doctor, Rachel Reaves,[15] is also at the Ambulatory Care Clinic at Chabert.

Plaintiff testified that she finished the eleventh grade, but cannot read small print. She said she does not have a driver's license and was driven to the hearing by her sister. She lives with her three children aged eleven, ten and six, and her brother. (Tr. 51).

Jones testified that she last worked a couple of years ago in a "sitting up job. Like, setting up little person," which only lasted a few months because she was always sick and unable to work, so she quit. Her response to the ALJ's question whether the job lasted from September 2011 to April 2012 was inaudible. (Tr. 51-52). When the ALJ inquired again later in the hearing, Jones said she did not remember how long the job lasted, but thought it was less than six months.

Plaintiff stated that, on a typical day, she reclines on the sofa all day because of shortness of breath. She stated that her daughter helps her get the children ready for school and her sisters check on her and help her with housework and cooking during the day. (Tr. 52-53). She said she cannot bathe and dress herself without assistance.

---

[14]Prozac (generic name: fluoxetine hydrochloride) is used to treat bulimia, panic disorder, obsessive compulsive disorder and major depressive disorder. PDR.net (PDR, LLC 2018), http://www.pdr.net/pdr-consumer-monograph/prozac?druglabelid=3205&ConsumerId=1362 (last visited Feb. 15, 2018).

[15]The transcript spells this phonetically as "Frasha Rees," but the medical records show that Nurse Practitioner Rachel Reaves prescribed fluoxetine on August 7, 2015. (Tr. 524-26).

Jones said she had not undergone ablation[16] or thyroidectomy because her doctor told her she could not have such treatment until her thyroid levels are under control. She testified that her thyroid levels are not under control when she is off her medication because she cannot afford it. She stated that her sister helps her with the cost when her sister can, but that plaintiff is "off my medicine a lot." (Tr. 53).

Plaintiff testified that she takes only metformin for diabetes. She stated that her Graves' disease causes pain in her eyes and headaches. She said she has shortness of breath, shaking in her hands, numbness in her feet, and pain in her fingers, toes and the bottom of her feet. (Tr. 54). She estimated that she can only stand for 30 to 60 minutes at a time because of pain and numbness in her feet. Jones said she can walk for a total of one-half block and would have to stop and rest during that distance because of shortness of breath. (Tr. 54-55). She stated that she walked slowly and that her sister helped her walk to the hearing from the parking lot. She estimated she can sit for 30 minutes at one time. (Tr. 55). She said she cannot lift anything.

Jones stated that her eyes sometimes feel scratchy, like something is in her eyes, and are always painful. She said she could see the people sitting across the table from her at the hearing, but they were blurry. She testified that she has headaches above her eyes related to her eye problems. (Tr. 56).

---

[16]Ablation is the "removal of a body part or the destruction of its function, as by a surgical procedure or morbid process, or the presence or application of a noxious substance." Stedman's Medical Dictionary, http://www.medilexicon.com/dictionary/118 (last visited Feb. 5, 2018).

Plaintiff said she cannot be around a lot of people because she gets nervous and her heart beats faster. (Tr. 56-57). She stated that her sister goes with her whenever she goes anywhere. She said she does not drive and has never read a computer screen. (Tr. 57).

Jones had no response to the ALJ's summary of Exhibit 9D showing that she earned almost $9,000 in 2012. (Tr. 58). She thought that her employer's name was Angel's Care. (Tr. 58-59). She did not think she worked there as long as six months, but she could not remember. She stated that she has not worked since then. (Tr. 59).

C.    Vocational Expert Testimony

A vocational expert, Beth Drury,[17] testified at the first hearing that plaintiff's work activity in the past 15 years was as a caregiver, which is a semiskilled job at the medium exertional level, and a fast food cashier, an unskilled job at the light exertional level.[18] (Tr. 43). At the second hearing, Drury[19] testified that plaintiff's work activity in the past

---

[17]The transcript identifies the expert phonetically as Ms. "Perry" (Tr. 29), but the ALJ's first decision and Drury's curriculum vitae provide the correct spelling. (Tr. 79, 130-31).

[18]Light work
involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.
20 C.F.R. § 404.1567(b). "'[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.'" Ramos v. Berryhill, No. EP-14-CV-433-MAT, 2017 WL 4820548, at *3 (W.D. Tex. Oct. 23, 2017) (quoting SSR 83-10, 1983 WL 31251, at *6 (1983)); accord Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988).

[19]Although the transcript phonetically spells the name of the vocational expert at the second hearing as "Brewer," the ALJ's opinion states that Beth Drury testified. (Tr. 11).

ten years has been as a caregiver, which is a light, semiskilled job, and a fast food cashier, a light, unskilled job. (Tr. 60). The ALJ did not pose any hypotheticals.

Plaintiff's attorney posed a hypothetical of a person with Jones's age, education and work experience who can never lift more than 11 pounds, can lift less than 11 pounds occasionally and can never carry any weight; can stand for less than an hour at a time for a total of less than one hour in an eight-hour day; can walk for less than 30 minutes at a time for a total of less than one hour in an eight-hour day; can never climb; can occasionally stoop, kneel or crouch; cannot read small print or ordinary newspaper or book print; has vision problems that cause her to bump into doors, other people and objects; would miss at least two to three days of work each week; and would need more than the standard three breaks per day, so she could recline during those breaks. Drury testified that no jobs would be available for such a person. (Tr. 60-61).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 15, 19-22). I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.     Plaintiff's Appeal

     1.     The ALJ's determination of plaintiff's residual functional capacity is
        <u>not supported by substantial evidence in the record.</u>

Before deciding at step four of the sequential evaluation whether a claimant can return to her past relevant work, the ALJ must determine the claimant's residual functional capacity, which is the person's "ability to do physical and mental tasks on a sustained basis despite limitations from her impairments.   In . . . [making this determination], the Commissioner must consider all of a claimant's impairments, including those that are not severe."   <u>Giles v. Astrue</u>, 433 F. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(e), 404.1545).   Residual functional capacity "is a determination of the most the claimant can still do despite [her] physical and mental limitations and is based on all relevant evidence."   <u>Perez</u>, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

The ALJ is solely responsible for assessing the medical evidence and determining the claimant's residual functional capacity.   <u>Taylor v. Astrue</u>, 706 F.3d 600, 602-03 (5th Cir. 2012); <u>Perez v. Heckler</u>, 777 F.2d 298, 302 (5th Cir. 1985).   Contrary to Jones's argument, "such an assessment is <u>not</u> a medical opinion."   <u>Joseph-Jack v. Barnhart</u>, 80 F. App'x 317, 318 (5th Cir. 2003) (emphasis added); <u>see also</u> <u>Bellanger v. Astrue</u>, No. 11-00634, 2012 WL 4210298, at *12 (E.D. La. Aug. 10, 2012) (citing SSR 96-8p, 1996 WL 374184 at *2 n.4 (July 2, 1996)) (A residual functional capacity "assessment, as opposed to a medical source statement, is an administrative finding of fact.").

The ALJ found that Jones has the residual functional capacity to perform light work and can perform her past relevant work as a fast food worker.  In making this finding, the ALJ afforded "little weight" to the opinions of plaintiff's treating endocrinologist, Dr. Chadha, and two consultative examiners, anesthesiologist Amit Prabhakar, M.D., and neurologist Daniella Miller, M.D., whose assessments of Jones's functional  limitations limited her to less than light work.  The ALJ discounted these opinions because he found them inconsistent with the consultative examiners' findings in their narrative reports and with plaintiff's treatment notes and/or based largely on her subjective complaints, which he found were not supported by the objective findings and were not credible.  (Tr. 21-22).

Jones argues that the ALJ erred in weighing the medical opinion evidence and that, having entirely "rejected" the opinions of Drs. Chadha, Prabhakar and Miller, the ALJ improperly substituted his own medical opinions based solely on the treatment records when assessing plaintiff's residual functional capacity.  Jones seeks a remand "for an additional evidentiary hearing with instructions that the ALJ simply evaluate medical opinions in a manner more consistent with the criteria of 20 C.F.R. 404.1527c[20] and proceed to the fourth step of the Sequential Evaluation."  Plaintiff's memorandum, Record Doc. No. 12 at p. 8.

---

[20]The cited regulation provides that the Commissioner will consider the examining relationship, treatment relationship, supportability, consistency, specialization and any other relevant factors when weighing medical opinions.  20 C.F.R. § 404.1527(c).  The ALJ in the instant case cited these factors. (Tr. 20-21).

a.    <u>Dr. Prabhakar's opinions</u>

The record contains three medical expert opinions.  Dr. Prabhakar conducted a consultative examination on November 2, 2013 to evaluate plaintiff's uncontrolled thyroid, Graves' disease, heart issues and diabetes.  He rendered a narrative report (Tr. 419-24) and a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on a seven-page form ("Medical Source Statement") supplied by the Commissioner.  (Tr. 425-31).  Dr. Prabhakar's Medical Source Statement limits Jones to lifting up to 10 pounds frequently and 20 pounds occasionally, and carrying up to 20 pounds frequently.  (Tr. 425). The doctor opined that Jones can sit for 20 minutes at a time for a total of two hours in an eight-hour work day, stand for one hour at a time for a total of two hours and walk for 20 minutes at a time for a total of one hour.  (Tr. 426).  Dr. Prabhakar placed no restrictions on plaintiff's use of her hands, but limited her to occasional use of foot controls because she "reports having constant [bilateral] foot pain/numbness."  (Tr. 427).  The physician stated that Jones can occasionally balance stoop, kneel, crouch or crawl, but can never climb stairs, ramps, ladders or scaffolds.

As to plaintiff's vision, Dr. Prabhakar opined that she can determine shape and color differences in small objects, but can<u>not</u> "avoid ordinary hazards in the work place, such as boxes on the floor, doors ajar, or approaching people or vehicles;" can<u>not</u> read very small print or ordinary newspaper or book print; and can<u>not</u> view a computer screen.  (Tr. 428). Dr. Prabhakar noted that Jones can never operate a motor vehicle.  (Tr. 429).  The doctor

further opined that Jones cannot shop, travel without a companion for assistance, use public transportation, handle or use paper/files, or prepare a simple meal and feed herself, but that she can care for her personal hygiene. (Tr. 430). As the Appeals Council noted in its remand order, Dr. Prabhakar's restrictions on sitting, standing and walking are compatible with a residual functional capacity for less than sedentary work. (Tr. 93).

According to Dr. Prabhakar's narrative report of his examination, Jones estimated she can lift eight pounds, can sit or stand for 15 minutes and can walk 20 to 30 feet. She reported that, despite compliance with her thyroid medication, she "has frequent 'bad days' where she is out of control" and has poor sleep because of inability to close her eyes secondary to proptosis.[21] She reported having sharp chest pain about once a week for five to ten minutes, alleviated by rest. Jones admitted she did not regularly check her blood sugar and had poor compliance with her diabetes medication and diet. She reported a "pins and needles feeling" in both hands and feet and a daily sharp pain (Tr. 419), presumably in her feet. She said she could not perform household activities because of pain and numbness in her feet and hands, could not dress or feed herself independently, and could not drive. (Tr. 420).

---

[21]Proptosis or its synonym, exophthalmos, is a forward projection or displacement of the eyeball. Stedman's Medical Dictionary, http://www.medilexicon.com/dictionary/72815 (last visited Jan. 8, 2018); MedlinePlus Medical Dictionary, http://c.merriam-webster.com/medlineplus/proptosis (last visited Jan. 8, 2018). Dr. Prabhakar's report says that Jones reports poor sleep because of her inability to "open" her eyes secondary to proptosis, but this statement makes no sense. The remainder of his report clarifies that proptosis causes Jones to be unable to close her eyes completely.

Dr. Prabhakar's clinical findings included visual acuity of 20/200 in each eye without glasses.[22] Jones exhibited "significant proptosis" of both eyes and "was unable to close her eyes completely at rest," but could close her eyes "using her accessory muscles." (Tr. 421). She had a two- to three-centimeter thyroid goiter, which reportedly caused difficulty swallowing. (Tr. 419, 421). She was tachycardic.[23] Although Jones had a normal gait and could stand without difficulty, she was unable to perform heel-to-toe walk and had "some difficulty" with tandem walk.[24] (Tr. 422). She climbed on and off the examining table and dressed and undressed independently. She "reported limited pain during [the] physical exam and evaluation." (Tr. 423). The remainder of Dr. Prabhakar's physical examination was within normal limits.

The ALJ gave "little weight" to Dr. Prabhakar's Medical Source Statement because "it is largely based on the claimant's subjective report of symptoms and it is inconsistent with the treatment record, which does not contain objective evidence of pain on standing

---

[22]Visual acuity of "20/20 is considered normal. 20/40 indicates that the line you correctly read at 20 feet (6 meters) away can be read by a person with normal vision from 40 feet (12 meters) away." MedlinePlus Medical Encyclopedia (A.D.A.M., Inc. 1997-2018), https://medlineplus.gov/ency/article/003396.htm (last visited Feb. 8, 2018).

[23]Tachycardia is "relatively rapid heart action whether physiological (as after exercise) or pathological." MedlinePlus Medical Dictionary, http://c.merriam-webster.com/medlineplus/tachycardia (last visited Jan. 5, 2018).

[24]"Walking on heels is the most sensitive way to test for foot dorsiflexion weakness, while walking on toes is the best way to test early foot plantar flexion weakness. Abnormalities in heel to toe walking (tandem gait) may be due to ethanol intoxication, weakness, poor position sense, vertigo and leg tremors." Stephen Russell & Marc Triola, The Precise Neurological Exam (New York University School of Medicine 2006), https://informatics.med.nyu.edu/modules/pub/neurosurgery/coordination.html (last visited Feb. 8, 2018).

or other extremity involvement due to diabetes," and because Jones told Dr. Prabhakar that "she <u>was</u> compliant with medications, but the record shows that statement is simply not true." (Tr. 21). As to specific inconsistencies, the ALJ stated that Jones "subjectively reported difficulty closing her eyes, but was able to actively do so;" she self-reported tachycardia and was tachycardic on examination, but other results were normal; despite her complaint of pain and pins and needles feelings in her hands and feet, she had no sensory deficits and her feet looked intact on examination; and she had a normal gait despite her difficulty with heel/toe and tandem walking. <u>Id.</u>

### b.    Dr. Chadha's opinions

After the ALJ's initial unfavorable decision, Dr. Chadha completed a one-page, preprinted, checklist form addressed "To Whom It May Concern" on July 14, 2014. (Tr. 563). Dr. Chadha checked "yes" to all four of the form's statements that Jones "suffers with daily tachycardia;" "Most days, must recline 2 or 3 times a day, as needed, for relief of dyspnea;"[25] "At least a couple of days a week, on average, she experiences 'bad days' during which she must recline much of the day;" and "strenuous activity [would] likely be deleterious to her health." <u>Id.</u> Dr. Chadha's only explanation is that Jones "has a history

---

[25]Dyspnea is "difficult or labored respiration." <u>MedlinePlus Medical Dictionary</u>, http://www.merriam-webster.com/medlineplus/dyspnea (last visited Feb. 2, 2018).

of Graves' disease and Graves' ophthalmoplegia,[26] which remain uncontrolled at this time."
Id. No specific clinical findings or narrative report accompany the checklist form.

The ALJ accorded Dr. Chadha's opinions "little weight," finding them unsupported
by the treatment record, "which shows infrequent treatment for self-reported cardiac
tachycardia and chest pain, but normal cardiac exam results." (Tr. 22). The ALJ found that
Dr. Chadha's comment about bad days was "clearly based on the claimant's subjective
report" because Jones was never hospitalized and Dr. Chadha thus was never "able to
observe the claimant over an extended period." (Tr. 22).

c.    Dr. Miller's opinions

As the Appeals Council directed in its remand order, Jones saw neurologist Dr.
Miller for a consultative examination on August 8, 2015. Dr. Miller provided a narrative
report (Tr. 508-13) and a Medical Source Statement. (Tr. 514-20). She opined on the
Medical Source Statement that Jones can lift up to ten pounds occasionally, but can never
carry any amount of weight. (Tr. 514). The doctor stated that Jones can sit for a total of
eight hours in an eight-hour work day, stand for a total of one hour and walk for a total of
30 minutes. (Tr. 515). Dr. Miller placed no restrictions on plaintiff's use of her hands.
The physician opined that Jones can never operate foot controls with either foot, with the

---

[26]Ophthalmoplegia is "paralysis or weakness of one or more of the muscles that control eye
movement. . . . Because the eyes do not move together in ophthalmoplegia, patients may complain of
double vision. Double vision is especially troublesome if the ophthalmoplegia comes on suddenly or
affects each eye differently." Gale Encyclopedia of Medicine (Gale Group, Inc. 2008), https://medical-
dictionary.thefreedictionary.com/ophthalmoplegia (last visited Feb. 12, 2018).

sole explanation being that Jones reportedly "doesn't drive cars." (Tr. 516). Dr. Miller stated that Jones can balance continuously; stoop, kneel, crouch and crawl occasionally; and never climb stairs, ramps, ladders or scaffolds. (Tr. 517).

As to plaintiff's vision, Dr. Miller opined that Jones can determine differences in small objects and avoid hazards such as boxes on the floor, doors ajar or approaching people or vehicles. However, the doctor noted that Jones "bumps into door & hallway." (Tr. 517). Dr. Miller opined that Jones cannot read either very small or ordinary newspaper or book print or view a computer screen. She explained that plaintiff "requires big writing to read." (Tr. 517). Dr. Miller stated that Jones can never operate a motor vehicle. The physician indicated that Jones cannot shop, walk a block at a reasonable pace on rough or uneven surfaces or travel without a companion for assistance, but can use a public bus if accompanied and can take care of her personal needs. (Tr. 519). Because of the restrictions on lifting, carrying, standing and walking, Dr. Miller's opinion would limit Jones to less than light work.

According to Dr. Miller's narrative report, Jones estimated she can lift four pounds, can sit for 30 minutes, can stand for 20 to 30 minutes and can walk one-half block. Jones reported blurry vision when in bright light, left eye pain and dry eyes. She admitted she forgets to take her diabetes medication about three times per week and does not eat breakfast, which causes her to feel weak and tired. She complained of decreased sensation in her feet. Jones stated that her Graves' disease causes panic attacks and mood instability.

She said she has headaches and increased sweating when not on her thyroid medications, but has symptoms even when taking her medicine. (Tr. 508). She told Dr. Miller that she "becomes angry and aggravated" when "her thyroid is 'out of whack,'" which made her unable to perform her previous job as a caregiver. Jones reported heart palpitations and shortness of breath when lying flat or standing up. (Tr. 509). She said she needs assistance performing household activities and cannot dress or feed herself independently. She does not drive. (Tr. 510).

On physical examination, Dr. Miller found that plaintiff's visual acuity without glasses was 20/100 in each eye (Tr. 511), but the doctor "was unable to see whether this would correct with glasses." Dr. Miller characterized plaintiff's vision as "extremely, extremely poor," such that Jones could not operate a car or other machinery or read small print. (Tr. 512). Dr. Miller noted that Jones had exophthalmos, a "very visible enlarged neck," brisk reflexes and difficulty with heel-to-toe walk, tandem gait and crouching, but was able to get on and off the examining table and dress independently. (Tr. 511-12). Dr. Miller opined that Jones had minimal symptoms associated with her diabetes when she took her diabetes medication and remembered to eat. (Tr. 512). Dr. Miller stated that plaintiff's Graves' disease was not adequately controlled by her current medication, which causes "exacerbations of disease" in the form of "panic attacks, headache, diaphoresis, and other symptoms representative of Graves' disease," including heart palpitations, and that Jones was meeting with her treating physician to try to adjust these issues. (Tr. 512-13). Dr.

Miller expected that such exacerbations would cause some work-related limitations, especially with respect to plaintiff's ability to concentrate and persist and interact socially within the work environment.  The doctor noted that, if Jones felt extremely uncomfortable and in distress because of heart palpitations, plaintiff "may feel that physically she is not able to perform certain tasks that require exertion" and she would have impaired concentration and ability to perform tasks. (Tr. 513).  Plaintiff's physical examination was otherwise unremarkable.

The ALJ afforded little weight to Dr. Miller's opinion because "it is internally inconsistent and inconsistent with the objective evidence of record."  Specifically, the ALJ stated that Jones was able to push, pull, reach, squat, stoop, climb on and off the examination table and dress independently during Dr. Miller's physical examination, contrary to plaintiff's reported inability to do those things at home.  The ALJ noted that Jones admittedly was not fully compliant with her diabetes medication, but that Dr. Miller found no evidence of diabetic neuropathy.[27]    (Tr. 21).   The ALJ stated that the exacerbations of inadequately controlled Graves' disease mentioned by Dr. Miller, such as plaintiff's heart palpitations, were subjective; that a recent examination by treating sources "had overall benign results;" and that Dr. Miller "failed to address repeated notation of non-

---

[27]Neuropathy is "a disease involving the cranial nerves or the peripheral or autonomic nervous system."  Stedmans Medical Dictionary, http://www.medilexicon.com/dictionary/60187 (last visited Feb. 8, 2018).  Symptoms of diabetic neuropathy may include numbness in hands, legs, or feet, or shooting pains, burning, or tingling.  MedlinePlus, https://medlineplus.gov/diabeticnerveproblems.html (last visited Feb. 8, 2018).

compliance in the record." (Tr. 21-22). However, Dr. Miller had no access to plaintiff's

medical records, so she could not address any such notations.

> d.    Fifth Circuit law regarding the ALJ's ability to determine
> residual functional capacity

In his decision, the ALJ summarized that his determination of plaintiff's capacity

for light work was supported by the objective findings in the record regarding her

functional limitations, the conservative treatment she had received and the ALJ's finding

that she was not entirely credible. Jones argues that, in assessing her residual functional

capacity, the ALJ improperly substituted his own "medical opinion" after "rejecting" the

opinions of Drs. Chadha, Prabhakar and Miller.

As an initial matter, the ALJ did not "reject," i.e., assign no weight to the expert

opinions. He accepted the physicians' diagnoses that were supported by the record when

he held that Jones has severe impairments of Graves' disease with ophthalmopathy, goiter

and diabetes. In assessing a residual functional capacity for light work, the ALJ implicitly

accepted Dr. Prabhakar's opinion regarding plaintiff's lifting and carrying ability, which

is consistent with light work; the absence of restrictions by Drs. Prabhakar and Miller on

plaintiff's use of her hands, despite her subjective complaint of numbness and pain in both

hands; and Dr. Chadha's opinion that Jones should not engage in "strenuous activity."

However, in assigning little weight to the bulk of those three opinions, it is accurate to say

that the ALJ relied on the medical treatment records, rather than on any expert medical

opinion, to make his residual functional capacity findings.

Jones argues that Williams v. Astrue, 355 F. App'x 828 (5th Cir. 2009), an unpublished, non-precedential decision, controls the instant case and requires a remand. The Williams panel relied on Ripley v. Chater, 67 F.3d 552 (5th Cir. 1995), a published, precedential decision. Contrary to Jones's contention based on Williams, the Ripley court held, as a matter of law, that an ALJ can determine a claimant's residual functional capacity without a medical opinion addressing her specific functional limitations, provided that the remainder of the evidence substantially supports the ALJ's determination.

The Ripley court remanded that case to the Commissioner for consideration of new and material evidence that had been obtained from plaintiff's back surgery, which took place after the Appeals Council denied review of the ALJ's decision. The court held that the new evidence, for the first time, provided objective evidence supporting plaintiff's subjective complaints and raised a reasonable probability of a different outcome. Id. at 555-56.

After holding that a remand was necessary to consider the new evidence, the Fifth Circuit addressed Ripley's argument that the ALJ had failed to develop the record fully when the ALJ found that plaintiff could perform sedentary work although the record contained no medical source statement. The court stated that the ALJ "[u]sually . . . should request a medical source statement describing the types of work that the applicant is still capable of performing. The absence of such a statement, however, does not, in itself, make the record incomplete." Id. at 557 (citing 20 C.F.R. § 404.1513(b)(6) (1994)) (emphasis

added).  In cases "where no medical statement has been provided, our inquiry focuses upon

whether the decision of the ALJ is supported by substantial evidence in the existing

record."  Id. (emphasis added); see also Gutierrez v. Barnhart, No. 04-11025, 2005 WL

1994289, at *7 (5th Cir. Aug. 19, 2005) (ALJ's residual functional capacity determination

was "based on substantial evidence even without such a medical opinion").  Thus, the ALJ

in any case is competent to assess the claimant's residual functional capacity even if the

record is devoid of an assessment by a medical source, Joseph-Jack, 80 F. App'x at 318

(citing 20 C.F.R. §§ 416.946, 416.927(e)), provided there is substantial evidence in the

existing record to support it.  Ripley, 67 F.3d at 557.

After stating this rule, the Fifth Circuit in Ripley then examined the record and held:

> After considering the evidence, however, we conclude that the ALJ's determination that Ripley was capable of performing sedentary work was not supported by substantial evidence.  The record includes a vast amount of medical evidence establishing that Ripley has a problem with his back.  What the record does not clearly establish is the effect Ripley's condition had on his ability to work.FN27  The only evidence regarding Ripley's ability to work came from Ripley's own testimony.  Therefore, on remand, we instruct the ALJ to obtain a report from a treating physician regarding the effects of Ripley's back condition upon his ability to work.FN29
>
> FN27 The Commissioner argues that the medical evidence substantially supports the ALJ's conclusion.  In making this argument, the Commissioner points to reports discussing the extent of Ripley's injuries.  Without reports from qualified medical experts, however, we cannot agree that the evidence substantially supports the conclusion that Ripley was not disabled because we are unable to determine the effects of Ripley's conditions, no matter how "small", on his ability to perform sedentary work.
>
> . . . .
>
> FN29 See 20 C.F.R. § 404.1527(c)(3) (1994) (requiring the recontacting of the treating physicians to obtain additional information

regarding an applicant's ability to work <u>when the record is insufficient to</u> <u>make a determination</u> of whether an applicant is disabled).

<u>Ripley</u>, 67 F.3d at 557-58 (footnote omitted) (emphasis added).

Thus, the Fifth Circuit held in <u>Ripley</u> that, because the record was insufficient to determine the effects of plaintiff's back condition on his residual functional capacity, substantial evidence did not support the ALJ's determination that plaintiff could perform sedentary work. The court directed the Commissioner to obtain a medical source statement from a treating physician on remand. The Fifth Circuit did <u>not</u> hold that the Commissioner must always obtain such a statement or that an ALJ cannot determine a claimant's residual functional capacity without one. Rather, the court held that, when there is no medical source statement, the ALJ may determine residual functional capacity if there is substantial evidence in the record to support the determination. Obviously, if the ALJ is competent to assess a claimant's residual functional capacity without <u>any</u> medical source statement, he is competent to do so in the instant case, in which the record contains three medical source statements from a treating physician and two consultative examiners, which the ALJ found are entitled to little weight–provided that other substantial evidence supports his functional findings.

Jones relies heavily on <u>Williams,</u> which addressed a factual situation somewhat similar to the instant case. The record in <u>Williams</u> contained the opinions of three treating physicians that supported plaintiff's claimed limitation to sedentary work, to which the ALJ declined to afford controlling weight. The Fifth Circuit stated that the ALJ "parsed through

27

Williams's medical record" to find that plaintiff had a residual functional capacity to stand for six hours, so that she could perform light work. <u>Williams</u>, 355 F. App'x at 829-30, 831. The Fifth Circuit assumed that the ALJ was entitled not to give the medical opinions controlling weight, but remanded the case to the Commissioner because

> there is still <u>no</u> evidence supporting the ALJ's finding that Williams can stand or walk for six hours in an eight-hour workday. In his findings, the ALJ appeared to base this RFC finding on two groups of evidence. First, the ALJ looked at the available objective medical evidence, and observed that she has "only mild to moderate stenosis" in her lumbar spine and "only posterior spurring" in her cervical spine. But **there is no evidence to suggest that Williams could perform light work with these conditions**. Second, the ALJ noted that Williams had undergone apparently successful physical therapy, restoring a significant amount of her range of motion. However, the ALJ failed to consider the physical therapy discharge summary, which stated that Williams–despite improving her range of motion in physical therapy–could still only stand for thirty minutes after completing her treatment.
>
> This evidence did not support the ALJ's finding that Williams was able to stand or walk for six hours in an eight-hour workday. Indeed, the physical therapy discharge summary directly contradicts the ALJ's finding. Thus, **the ALJ impermissibly relied on his own medical opinions as to the limitations presented by "mild to moderate stenosis" and "posterior spurring" to develop his factual finding**. We therefore conclude the ALJ's findings regarding Williams's RFC were not supported by substantial evidence. See <u>Ripley v. Chater</u>, 67 F.3d 552, 557-58 (5th Cir. 1995).FN6
>
> . . . .
>
> FN6  In <u>Ripley</u>, we held that an **ALJ may not–without opinions from medical experts–derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions. Thus, an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions**. <u>See</u> <u>Ripley</u>, 67 F.3d at 557.

<u>Id.</u> at 831-32 (footnotes omitted) (underlined emphasis in original; bold emphasis added).

28

The sentence about the ALJ substituting his own medical opinions and footnote 6 in Williams overstate Ripley's holding.  The Ripley court did not say that the ALJ may not derive a claimant's residual functional capacity from the evidence of her medical conditions without opinions from medical experts or that such a determination is an impermissible medical opinion.  Ripley stated that an ALJ may derive a claimant's residual functional capacity from the medical records without a medical source statement, but the court held as a factual matter that substantial evidence in that record did not support the ALJ's residual functional capacity assessment.  Another Fifth Circuit panel has also held, contrary to the statement in Williams that the ALJ impermissibly substituted his own medical opinions when assessing residual functional capacity, that "such an assessment is not a medical opinion," Joseph-Jack, 80 F. App'x at 318 (emphasis added), and the Commissioner's policy guidance agrees.  See SSR 96-5P, 1996 WL 374183 at *2 (July 2, 1996) (Issues such as what an individual's residual functional capacity is and whether his residual functional capacity prevents him from doing past relevant work are "not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings."); SSR 96-8p, 1996 WL 374184 at *2 n.4 (A residual functional capacity "assessment, as opposed to a medical source statement, is an administrative finding of fact.").

Some district courts have  interpreted Williams "as requiring a 'positive statement' or 'positive evidence' from a medical source that the plaintiff could, despite her limitations,

perform the exertional demands of the work the claimant was deemed to be capable of performing by the ALJ," when the ALJ has discounted the weight of medical opinions in the record.  Brown v. Astrue, No. 09-00487, 2010 WL 4825391, at *15 (M.D. La. Nov. 1, 2010), report & recommendation adopted, 2010 WL 4823368 (M.D. La. Nov. 22, 2010) (emphasis added); see also cases cited id. at n.4 and in Jones's memorandum, Record Doc. No. 12 at p. 5, n.1.  However, even if Williams is regarded as persuasive, that court did not direct the Commissioner to obtain any additional "positive" medical source statement, but merely "remanded for further proceedings consistent with this opinion."  Williams, 355 F. App'x at 832.  No Fifth Circuit case, including the binding decision in Ripley, has stated that "a 'positive statement' or 'positive evidence' from a medical source" is always required for an ALJ to assess residual functional capacity.

Williams is consistent with Ripley to the extent that the Williams court found, as a factual matter, "no evidence" in the record to suggest that plaintiff could perform light work.  Fifth Circuit panels in two other unpublished cases, Holifield v. Astrue, 402 F. App'x 24 (5th Cir. 2010), and Gutierrez v. Barnhart, No. 04-11025, 2005 WL 1994289 (5th Cir. Aug. 19, 2005), rejected the argument that Jones makes in this court that the ALJ impermissibly determined the plaintiffs' residual functional capacities in the absence of any medical expert opinions, when the ALJ gave little or no weight to the medical source statements in the record and based the plaintiffs' residual functional capacities on the

treatment records and the ALJ's credibility findings.  The Fifth Circuit in each of these cases found that the record evidence substantially supported the ALJ's decision.

In <u>Gutierrez</u>, the ALJ "essentially rejected" the functional limitations assessed by a treating doctor and a non-examining physician who reviewed the medical records, finding that the opinions were inconsistent with plaintiff's treatment records that spanned eight years. <u>Gutierrez</u>, 2005 WL 1994289, at *6.  The Fifth Circuit found that the ALJ's residual functional capacity determination was "based on substantial evidence even without such a medical opinion" because "the ALJ made adverse credibility determinations against Gutierrez based on at least six inconsistencies within her medical record and/or testimony" and based plaintiff's residual functional capacity "on several available pieces of evidence in the record, including [plaintiff's] own testimony" about "her daily capabilities, [the ALJ's] observations of her during the hearing, and medical evidence that demonstrated improvement in certain conditions rather than further degeneration."  <u>Id.</u> at *6-7 (citing <u>Ripley</u>, 67 F.3d at 557).  The Fifth Circuit held that,

> unlike the ALJ in <u>Ripley</u>, the court finds that the ALJ had <u>substantial evidence from both lay and medical sources with which to fully and fairly develop the record without having to obtain a report from a treating physician</u>.  The ALJ possessed evidence to fully and fairly develop the record given the noted inconsistencies between Gutierrez's testimony and the medical reports obtained and her own testimony reflecting her abilities to conduct daily tasks.  The ALJ also possessed evidence indicating the lack of any neurological deficits to explain certain alleged medical symptoms relating to Gutierrez's claim of disability.

<u>Id.</u> at *8 n.5 (citing <u>Ripley</u>, 67 F.3d at 557) (emphasis added).

Similarly, in <u>Holifield</u>, 402 F. App'x at 26, the court disagreed with plaintiff's argument that the ALJ had substituted his medical opinion for that of a treating doctor on a checklist form to which the ALJ gave little weight.  Although the record contained no other medical source statement, the Fifth Circuit held that

> the ALJ did not err in discounting the probative value of Dr. Purser's medical opinions, which, as noted above, were not only conclusory and unsubstantiated, but actually contradicted by objective medical evidence in the record.  Moreover, . . . [another] treating physician, made [physical] findings inconsistent with Dr. Purser's conclusions following a physical examination of Holifield.  And since <u>Holifield provided no other reliable evidence proving he was limited to less than a full range of sedentary work</u>, the ALJ did not err by declining to give Dr. Purser's opinions controlling weight [and by determining plaintiff's residual functional capacity based on other record evidence].

<u>Id.</u> at 26 (citing 20 C.F.R. § 404.1545(a)(3); <u>Ripley</u>, 67 F.3d at 557) (emphasis added).  In addition, the court held that the ALJ had no duty to recontact Dr. Purser because the record "contains medical opinion evidence from treating physicians–namely, treatment records from" two other doctors that constituted "reliable medical evidence controverting Dr. Purser's opinions" sufficient for the ALJ to make a decision.

Considering these three unpublished decisions as persuasive, but not creating a new or binding rule of law, this court follows the directives of <u>Ripley</u>.  Assuming that the ALJ was entitled to give little weight to the three medical source statements, the court examines the entirety of the record to determine whether the ALJ's decision is supported by substantial evidence.

e.    The ALJ's residual functional capacity determination is not
<u>supported by substantial evidence</u>

This court finds that the ALJ's decision is <u>not</u> supported by substantial evidence in the record, for the following reasons that are discussed in detail below.  First, the ALJ failed to address what effect plaintiff's vision difficulties, which are substantially supported by objective findings, would have on her ability to return to her past relevant work as a fast food cashier.  Second, the ALJ made factual errors in his review of the record that negatively affected his assessment of plaintiff's credibility.  The credibility assessment was a major factor in the ALJ's decision to discount plaintiff's subjective complaints and the three medical opinions that the ALJ found entitled to little weight because they relied on plaintiff's subjective complaints.  Third, the ALJ observed that Jones had been treated conservatively, which lessened the credibility of her claimed limitations.  However, the ALJ did not address the reasons for Dr. Chadha's recommendations that Jones not have radioactive iodine ablation ("RAI"), which were based on plaintiff's circumstances at the time, not because Dr. Chadha opined that more aggressive treatment was not warranted.  Finally, substantial evidence supports the ALJ's findings that Jones has no medically determinable cardiac condition, that her diabetes was under control and that she had no physical examination findings of limitations caused by diabetes or heart disease.  However, the ALJ does not seem to have assessed whether, in the absence of objective findings of cardiac disease and with physical examination findings of full range of motion and grossly intact neurological functions of plaintiff's extremities, her alleged symptoms, particularly

of extreme dyspnea and pain in her feet, and the restrictions imposed by the three medical opinions based on such symptoms could reasonably be caused by plaintiff's severe impairment of uncontrolled Graves' disease and large goiter pressing on her throat. To put it another way, given that Jones has no cardiac disease, underlying musculoskeletal condition or nerve or foot damage as a result of diabetes, can uncontrolled Graves' disease itself substantially be the cause of her alleged symptoms and functional limitations <u>without any additional physical findings</u> besides her documented vision problems, excessive thyroid hormone levels, goiter, occasional tachycardia and fine tremors in her hands? If the answer is yes, it would explain why neither the consultative examiners nor Dr. Chadha supported their opinions of a very limited functional capacity to stand or walk with additional clinical findings related to dyspnea and foot and leg pain. It appears that medical expert testimony is needed to address this question.

As to the first issue, Dr. Prabhakar measured plaintiff's visual acuity as 20/200 in each eye on November 2, 2013 (Tr. 421) and Dr. Miller measured it as 20/100 on August 8, 2015 (Tr. 511) in each eye, which Dr. Miller characterized as "extremely, extremely poor." (Tr. 512). Both doctors opined that Jones cannot read ordinary book or newspaper print or view a computer screen. Jones routinely complained to her ophthalmologist and other physicians of dry, gritty, painful eyes and blurry and/or double vision (Tr. 339, 346, 358, 362, 372, 411, 442, 459, 464, 466, 546), which were diagnosed as caused by uncontrolled Graves' disease, not by diabetes.

34

During regular ophthalmologic examinations from 2012 through 2015, plaintiff's visual acuity was at best 20/100 in each eye, with a reading of 20/200 in her right eye on May 19, 2014, and abnormal findings on slit lamp examination[28] of both eyes at each visit. (Tr. 358, 410, 462, 466, 544-45). Both eyes were injected[29] on March 7 and June 11, 2012; she had exposure keratopathy[30] and extrusion on March 27, 2012; and her right eye had draining fluid and increased itching on July 1, 2013. (Tr. 358, 359, 410, 415). Consistent with, or perhaps worsened since, Dr. Prabhakar's finding on November 2, 2013 that Jones "was unable to close her eyes completely at rest" (Tr. 421), Dr. Chadha on July 14, 2014 diagnosed ophthalmoplegia, or paralysis or weakness of the muscles that control eye movement. (Tr. 563). On November 17, 2014, Jones's treating ophthalmologist confirmed that she had exposure keratopathy with lagophthalmos,[31] despite improved compliance with her medications for Graves' disease. (Tr. 462-64). No treating physician ever suggested that plaintiff's vision problems could be corrected with glasses. The ALJ failed to address the effects of plaintiff's objectively documented vision problems on her ability to perform her past relevant work as a fast food cashier. On remand, the testimony of a medical expert

---

[28]Slit-lamp examination looks at the eyelids, cornea, conjunctiva, sclera and iris. Medline Plus Medical Encyclopedia, https://medlineplus.gov/ency/article/003880.htm (last visited Feb. 14, 2018).

[29]Injected means "visible blood vessels distended with blood." Stedmans Medical Dictionary, http://www.medilexicon.com/dictionary/44689 (last visited Feb. 12, 2018).

[30]Keratopathy is "[a]ny corneal disease, damage, dysfunction, or abnormality." Id., http://www.medilexicon.com/dictionary/46880 (last visited Feb. 12, 2018).

[31]Lagophthalmos is "[a] condition in which a complete closure of the eyelids over the eyeball is difficult or impossible." Id., http://www.medilexicon.com/dictionary/47653 (last visited Feb. 12, 2018).

and/or vocational expert may be necessary to explain the effects of these problems on plaintiff's ability to perform that job or, if the sequential evaluation proceeds to step five, any other job.

Second, the ALJ made factual errors in his review of the record that negatively impacted his assessment of plaintiff's credibility and therefore his determination of the weight afforded to the medical experts' opinions, which he discounted in part because they were based on plaintiff's subjective complaints. "[A]n ALJ's assessment of a claimant's credibility is accorded great deference" <u>only if</u> the record contains substantial evidence to support the decision. <u>Newton</u>, 209 F.3d at 459. In this case, the ALJ stated incorrectly that the record shows that Jones smoked cigarettes in May 2013 and "continued to smoke" in May 2014. (Tr. 19, citing Exhibit 6F at pp. 7, 9 and Exhibit 8F at pp. 36, 38). The cited records do <u>not</u> say that Jones smoked. Next to the line for "Past Social History: Smoke" on pages 7 of Exhibit 6F and 36 of Exhibit 8F, there is a handwritten (or, more accurately, hand-scrawled) circle with a line through it, which is a symbol for "negative" or "none" that the ALJ interpreted as being a "positive" notation. The "PPD" (packs per day) line after the smoking history line is clearly blank on page 7 of Exhibit 6F, while the PPD line on page 36 of Exhibit 8F has a line through it, which may be interpreted as a "positive" check, but is certainly not a number. (Tr. 411, 467). There is no mention of smoking whatsoever on pages 9 of Exhibit 6F or 38 of Exhibit 8F. (Tr. 413, 469).

Even if these two handwritten symbols could be interpreted as "positive" for smoking, they are anomalies that are contradicted by numerous clear statements in the record that Jones was not a smoker. (Tr. 326, 332, 359, 362, 371, 381, 400, 411, 420). The ALJ exaggerated when he said, based on only two notations, that "it was noted throughout the record that the claimant smokes cigarettes." (Tr. 20). He engaged in unfounded speculation when he said that "[c]learly, a good portion of the claimant's resources is used for cigarettes instead of medicine," id., when the record contains no indication whether, if Jones did smoke, she smoked as much as one cigarette per day, much less a significant number of expensive packs per day. The ALJ used these inaccurate facts as evidence that undermined plaintiff's credibility regarding her symptoms and limitations. Notably, the ALJ did not ask Jones at the hearing whether she smoked. With respect to smoking, the ALJ failed to follow the rule that he "must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." Stephens v. Barnhart, 174 F. App'x 232, 233 (5th Cir. 2006) (quoting Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000)).

The ALJ also focused on the unsupported allegations of eye and thyroid cancer in plaintiff's disability report. However, a careful reading of the record as a whole indicates that Jones never asserted such claims to any medical provider, in her testimony, or in the briefing or oral arguments of the attorney who represented her after the ALJ's first unfavorable decision. Plaintiff's original disability report, which was prepared by an

attorney in Utah and not signed by Jones (Tr. 231), alleged that she had eye and thyroid cancer.  Those allegations were necessarily repeated throughout the Commissioner's consideration of plaintiff's applications.  Nonetheless, the medical record is clear that Jones was never diagnosed with any type of cancer and never told any treating or examining physician that she had cancer.  Dr. Miller included eye cancer and thyroid cancer in the list of problems to be evaluated in her narrative report because those conditions were reported to her in the Commissioner's consultative examination order.  (Tr. 507).  Dr. Miller noted in her report that Jones never had cancer (Tr. 508, 509), which Jones obviously told the doctor during the examination, yet the ALJ seemed to find that this undermined plaintiff's credibility.  (See the ALJ's opinion at Tr. 21:  "[D]espite the claimant's allegations, she did not have a history of eye cancer . . . .").  After the first unfavorable decision, Jones hired a new attorney, whose pre-hearing brief (Tr. 298) and opening statement at the second hearing, which the ALJ summarized in his decision (Tr. 17), did not allege that she had cancer.  Jones never testified that she had eye pain due to cancer, as the ALJ incorrectly stated.  (Tr. 18).  Rather, she related her eye pain to her Graves' disease.  (Tr. 54, 56).

As to the ALJ's finding that plaintiff's history of conservative treatment did not support her claims of disability, he failed to note that, although Dr. Chadha did not recommend RAI ablation of plaintiff's thyroid or thyroidectomy as treatment for her Graves' disease on July 14, 2014, Dr. Chadha stated that she had discussed those procedures with Jones as options "once labs are more normal in the future."  (Tr. 442).

This indicates that conservative treatment would continue and aggressive treatment would not be considered until plaintiff's thyroid hormone levels became better, not worse, which seems opposite to the ALJ's view that conservative treatment indicates less severe disease symptoms.  Also, Dr. Chadha noted that "future options at this time include RAI ablation (but lives with her three children)[32] vs thyroidectomy (if compressive symptoms worsen)." (Tr. 443).  Similarly, Dr. Chadha did not recommend RAI ablation on October 17, 2014 because of "considerably [sic] eye involvement and also [plaintiff's] desire for fertility in the future."[33]  (Tr. 462).  On March 23, 2015, Dr. Chadha again counseled Jones about the risks to future pregnancies of using RAI.  (Tr. 537).  Thus, it appears that more aggressive treatment was recommended, but was not a viable option for Jones because of the risks.

Ultimately, the ALJ discounted the credibility of plaintiff's alleged symptoms and physical limitations and the medical expert opinions based on those symptoms because of Jones's normal cardiac, musculoskeletal and neurological examinations and other negative findings in the record related to her diabetes, which was under control.  However, the ALJ did not address whether plaintiff's severe impairments of uncontrolled Graves' disease and

---

[32]Generally, "following radioactive iodine therapy, you will need to take certain precautions to prevent radiation exposure to others. . . .  Personal contact with children . . . should be avoided for 3 to 7 days, depending on the strength of your dose."  Restrictions against sharing a bed, dishes, utensils, personal items and laundry are also necessary for a few days after the therapy.  EndocrineWeb.com (Vertical Health LLC 2018), https://www.endocrineweb.com/conditions/hyperthyroidism/radioactive-iodine-hyperthyroidism (last visited Feb. 14, 2018).

[33]"Pregnant women or women who want to become pregnant in the next 6 months should not use radioactive iodine, as the treatment can destroy the fetus's thyroid and impair its development.  In fact, women should wait a year before conceiving if they have been treated with the therapy.  Women who are breast-feeding should also not use radioactive iodine."  Id.

goiter could reasonably cause her alleged symptoms and limitations, including pain in her feet, tachycardia and shortness of breath, without additional positive findings on physical examination with respect to her extremities, heart and peripheral nervous system.  Dr. Prabhakar measured plaintiff's goiter as two by three centimeters on November 2, 2013 (Tr. 421), which Dr. Chadha described on July 26, 2011 and May 29, 2013 as enlarged about 2.5 times the upper limit of normal (Tr. 363, 412) and which caused "compressive (mild) symptoms" and shortness of breath when lying down due to neck fullness on July 14, 2014.  (Tr. 442-43).  Both Dr. Chadha's checklist opinion and plaintiff's testimony emphasized that shortness of breath is a major exertional problem, along with pain in Jones's feet.  Tachycardia was present occasionally on physical examination, but Jones never described it as constant and no physician diagnosed it as being caused by heart disease, although the ALJ discounted the credibility of the symptom because of plaintiff's otherwise normal cardiac examinations.   Jones was tachycardic at examinations on February 21, 2011 and March 7, 2012 (Tr. 360, 372), and when she saw Dr. Prabhakar on November 2, 2013 (Tr. 422), despite otherwise normal cardiac findings at each visit. Tachycardia was diagnosed to be a result of Graves' disease.  The ALJ also failed to address the objective findings of Drs. Prabhakar and Miller that, despite plaintiff's normal gait, she was unable to perform or had difficulty performing heel-to-toe walk and tandem gait, which may indicate that she was less capable of standing and walking than the ALJ assessed.  (Tr. 422, 511-12).

On this record, as in <u>Ripley</u> and <u>Williams</u>, the ALJ's finding that Jones is capable of standing and/or walking for six hours and performing the full range of light work is <u>not</u> substantially supported by the evidence. It appears that what may be needed is to recontact Dr. Chadha to clarify the clinical findings that support the opinions in her checklist form and in the consultative examiners' Medical Source Statements, and/or to obtain expert medical testimony from a qualified physician who can review the entire medical record and address these questions. An appropriate residual functional capacity determination can be made only with such evidence in the record and with the incorrect factual assumptions noted above corrected.

CONCLUSION

The court does not suggest that plaintiff failed to receive a full and fair administrative consideration of her claim. The court is acutely aware that Congress intended that there be an end to the administrative handling of Social Security claims and that there are financial and time burdens placed on the Social Security Administration when claims are returned for further consideration. The court does not take lightly its authority to remand. However, after careful review of the entire administrative record, the court finds that the interests of justice would best be served by remanding this matter to the Commissioner for further proceedings consistent with this opinion.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner be REVERSED and that this matter be REMANDED for further proceedings consistent with this report and recommendation, including, if the Commissioner deems it necessary, obtaining additional evidence in the form of clarification from plaintiff's treating physician(s), a consultative examination, medical expert testimony and/or vocational expert testimony.  See 20 C.F.R. § 404.983 (following a federal court remand, "[a]ny issues relating to your claim may be considered by the administrative law judge whether or not they were raised in the administrative proceedings leading to the final decision in your case.").

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[34]

New Orleans, Louisiana, this _____23rd_____ day of February, 2018.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[34]<u>Douglass</u> referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.